OPINION
{¶ 1} Defendant-appellant, Christopher Scott, appeals from a Mahoning County Common Pleas Court judgment convicting him of aggravated murder and attempted aggravated murder, both with firearm specifications, following a jury trial.
 {¶ 2} The facts giving rise to this case occurred in the early morning hours of January 18, 1997. Albert Byrd and his 16-year-old girlfriend, Lori Townsend, were walking from Ms. Townsend's grandmother's house on Warren Avenue in Youngstown, to a convenience store to buy soda. On their way to the store, they encountered appellant and Kendrick Mickel.
 {¶ 3} According to Byrd, appellant and Mickel yelled at the couple. Byrd stated that he knew appellant and Mickel were trouble and he had previously had an altercation with appellant. So he and Ms. Townsend began to walk quickly away from them. Appellant and Mickel trotted after them. As a car pulled up, Byrd ushered Ms. Townsend into the backseat and jumped in beside her. As Byrd closed the door, a gunshot was fired hitting Ms. Townsend in the head. She died as a result. Byrd identified appellant as the gunman.
 {¶ 4} After the shot was fired appellant and Mickel ran down the street. Byrd jumped out of the car and ran back to Ms. Townsend's grandmother's house where he called 911. As the police were driving Byrd to the station for questioning, he spotted appellant walking down the street. Byrd immediately informed the officers that appellant was the man who shot Ms. Townsend and they arrested him.
 {¶ 5} On March 14, 1997, a Mahoning County Grand Jury indicted appellant on one count of aggravated murder, a first degree felony in violation of R.C. 2903.01(A)(C), with a firearm specification in violation of R.C. 2941.145(A). A superceding indictment was later filed adding one count of attempted aggravated murder, a first degree felony in violation of R.C.2923.02(A)(E) and 2903.01(A)(C), with a firearm specification. The case proceeded to a jury trial in November 1997, and the jury found appellant guilty of both charges and specifications. He appealed and this court reversed his convictions and remanded the case finding the trial court improperly excluded the testimony of several defense witnesses. See State v. Scott (Sept. 21, 2001), 7th Dist. No. 98 CA 124.
 {¶ 6} Appellant proceeded to his second jury trial on October 21, 2002. The jury returned guilty verdicts on both counts and specifications. In its November 7, 2002 judgment entry, the trial court sentenced appellant to 20 years to life for aggravated murder, ten years for attempted aggravated murder, and three years for the firearm specifications, which merged together. It ordered appellant to serve all sentences consecutively. Appellant filed a timely notice of appeal on November 19, 2002.
 {¶ 7} Appellant raises four assignments of error, the first of which states:
 {¶ 8} "The state violated appellant Scott'sFourteenth Amendment due process rights when it failed to preserve material evidence by not performing timely gun residue tests upon a potential principle (sic) in the crime."
 {¶ 9} Upon appellant's apprehension, the police performed a gunshot residue test on his hands. (Tr. 248-50). The test revealed two particles of gunshot residue on appellant's left hand and seven particles on his right hand (Tr. 345-46).
 {¶ 10} Appellant claims that plaintiff-appellee, the State of Ohio, failed to preserve exculpatory evidence because it did not conduct a gunshot residue test on Mickel. Appellant states that his defense was based on the premise that it was Mickel, not he, who shot Ms. Townsend. He argues that had the police tested Mickel's hands for gunshot residue, it could have shown that Mickel too had gunshot residue, calling into question whether appellant was the shooter.
 {¶ 11} The Due Process Clause of the Fourteenth Amendment to the United States Constitution protects a criminal defendant from being convicted of a crime where the state either fails to preserve materially exculpatory evidence, or destroys in bad faith potentially useful evidence. Arizona v. Youngblood
(1988), 488 U.S. 51, 58; California v. Trombetta (1984),467 U.S. 479, 489.
 {¶ 12} In this case, appellee was never in the position to preserve materially exculpatory evidence or to destroy potentially useful evidence. It was impossible for appellee to preserve the evidence appellant suggests it should have preserved. Although the police put a warrant out for Mickel's arrest upon Byrd's identification of Mickel as the person with appellant that night, they did not apprehend Mickel until two to three months later. (Tr. 372-73, 396-97). Jeffrey Lynn, the crime lab director at the Bureau of Criminal Identification and Investigation (BCI), testified that gunshot residue generally remains on a person's hands for approximately two hours after contact. (Tr. 348-49). Thus, a gunshot residue test performed months after the shooting would have been futile. Accordingly, appellant's first assignment of error is without merit.
 {¶ 13} Appellant's second assignment of error states:
 {¶ 14} "The trial court erred when it gave an incorrect jury instruction as to transferred intent that amounted to plain error under criminal rule 52(b)."
 {¶ 15} Appellant claims that the trial court gave the jury an incorrect instruction on transferred intent. He takes issue with the instruction:
 {¶ 16} "If you find the defendant did have a purpose to cause the death of a particular person and that the shot accidentally caused the death of another person, then the defendant would be just as guilty as if the shot had taken effect upon the person intended." (Tr. 606).
 {¶ 17} Appellant argues that this instruction implied to the jury that if he accidentally caused the death of another, he could be convicted of aggravated murder. He asserts that the court's definition of transferred intent was ambiguous and possibly led to an incorrect application by the jury. Appellant contends that this incorrect instruction constituted plain error because it did not convey the idea that in order to be guilty of Ms. Townsend's aggravated murder, the jury had to first find that appellant intended to kill Byrd. He argues that the court's instruction allowed the jury to find him guilty of aggravated murder under a standard of accidentally causing Ms. Townsend's death.
 {¶ 18} Appellant failed to object to this instruction at trial. "The failure to object to a jury instruction constitutes a waiver of any claim of error relative thereto, unless, but for the error, the outcome of the trial clearly would have been otherwise." State v. Underwood (1983), 3 Ohio St.3d 12, syllabus; Crim.R. 30(A). Thus, we will review the court's instruction for plain error.
 {¶ 19} When examining the propriety of jury instructions, we should not dissect them and examine them piece-by-piece, but should review the entire instruction in the proper context.State v. Adams, 7th Dist. No. 02-JE-32, 2003-Ohio-1225, at ¶ 17.
 {¶ 20} Appellant fails to take into consideration the jury charge as a whole. Immediately after the court instructed the jury as indicated above, it continued:
 {¶ 21} "The purpose required is to cause the death of another, not any specific person. If the shot missed the person intended but caused the death of another, the element of purpose remains and the offense is as complete as though the person for whom the shot was intended had died. However, if there was no purpose to cause the death of anyone, then the defendant cannot be found guilty of any of the charges." (Tr. 606-607).
 {¶ 22} And earlier in its charge, the court instructed:
 {¶ 23} "It must be established in this case that at the time in question there was present in the mind of the defendant, Mr. Scott, a specific intention to cause the death of another.
 {¶ 24} "* * *
 {¶ 25} "Purpose is a decision of the mind to do an act with a conscious objective of producing a specific result or engaging in a specific conduct. To do an act purposely is to do it intentionally and not accidentally.
 {¶ 26} "* * *
 {¶ 27} "No person may be convicted of aggravated murder unless he specifically intended to cause the death of another." (Tr. 596-98).
 {¶ 28} When considering the court's instruction as a whole, it is clear that the court did not err in instructing the jury. Appellant alleges the instruction led the jury to conclude that if he accidentally killed Ms. Townsend, he was guilty of aggravated murder. However, upon reading the entire instruction in context, we conclude the court properly explained how transferred intent worked and the specific purpose the jury had to find appellant acted with. The court made it abundantly clear that before they could convict appellant of aggravated murder, the jury had to find that appellant had the intent to kill.
 {¶ 29} Additionally, a similar argument was raised and rejected in State v. Jackson (Apr. 20, 2000), 8th Dist No. 76141. In examining the same instruction for plain error, the court concluded that it merely informed the jury that if the defendant intended to kill when he pulled the trigger, it was irrelevant whom he actually killed. Id. And as will be discussed fully in appellant's fourth assignment of error, the evidence supported appellant's convictions. Thus, we cannot conclude that the outcome of the trial would have clearly been otherwise had the court not given the contested instruction. Hence, appellant's second assignment of error is without merit.
 {¶ 30} Appellant's third assignment of error states:
 {¶ 31} "The trial court violated appellant Scott'sFifth Amendment privilege against self-incrimination when it failed to allow the testimony of deputy sheriff sargianopolous who could have testified to information that appellant Scott had no other means of having presented except through appellant Scott himself."
 {¶ 32} During trial, appellant sought to introduce testimony from Deputy Sheriff Joseph Sargianopolous regarding appellant's and Mickel's behaviors in jail. The parties questioned Deputy Sargianopolous out of the jury's hearing so that the court could determine whether his testimony was admissible. It concluded that the testimony was not admissible. Appellant sought to introduce two areas of testimony from Deputy Sargianopolous, one concerning his and Mickel's demeanors while in jail and another concerning a conversation Deputy Sargianopolous had with appellant.
 {¶ 33} Deputy Sargianopolous would have testified to the following. He worked in the county jail while appellant and Mickel were housed there together. (Tr. 440). He stated that while in jail, Mickel asked questions about physical evidence and potential suspects. (Tr. 440). He further stated that Mickel was very inquisitive and anxious. (Tr. 441). As to appellant, Deputy Sargianopolous testified that he was "more or less passive." (Tr. 441). He agreed with defense counsel that appellant did not seem worried or concerned. (Tr. 441). Additionally, Deputy Sargianopolous stated that he had a conversation with appellant while appellant was in jail. He testified that appellant told him that Mickel was the one who had done the shooting. (Tr. 442). Deputy Sargianopolous further testified that appellant told him that he could not testify against Mickel because then he would be in fear for his life, so he was better off doing the time rather than going out on the street after snitching on Mickel. (Tr. 442).
 {¶ 34} While appellant did request that the court allow Deputy Sargianopolous to give the above testimony, he did not raise a Fifth Amendment argument at trial as he does now. Furthermore, his argument now alleges only a violation of hisFifth Amendment rights and does not attack the court's ruling on any other evidentiary basis.
 {¶ 35} The Fifth Amendment to the United States Constitution provides that no person shall be compelled to be a witness against himself. In this case, appellant chose not to take the stand in his own defense.
 {¶ 36} In State v. Roberts (1980), 62 Ohio St.2d 170, the defendant argued the joinder of indictments in his case amounted to a Fifth Amendment violation because he wished to testify on his own behalf in one of the cases but not the other. He contended that the joinder forced him to testify on both matters. The defendant argued on appeal that because a jury may be tempted to infer guilt from a defendant's refusal to testify on his own behalf, this adverse inference would be compounded if the defendant testified on some charges, but in the same trial refused to testify on other charges. Therefore, he contended he was compelled to testify in contravention of the Fifth Amendment in order to avoid this increased inference of guilt. The Ohio Supreme Court, overruling appellant's argument, concluded that any adverse inference the jury could have drawn if the defendant failed to testify in one of the cases was not constitutionally different from an inference the jury could draw from his failure to testify in a combined-indictment trial. Id. at 176. It reasoned:
 {¶ 37} "In each instance, the fact that an accused is faced with the determination whether to testify to avoid a possible adverse inference does not amount to that coercion which theFifth Amendment was designed to prohibit. See Williams v.Florida (1970), 399 U.S. 78, 90 S.Ct. 1893, 26 L.Ed.2d 446. Rather, it is one of those `difficult judgments' which the judicial process requires its participants to weigh and consider.McGautha v. California (1971), 402 U.S. 183, 213,91 S.Ct. 1454, 1470, 28 L.Ed.2d 711." Id.
 {¶ 38} As was the case in Roberts, appellant here was faced with a difficult judgment whether to testify. He chose not to testify. Appellant's decision to invoke his privilege not to testify was a trial tactic. See In re Brewer (March 9, 2001), 7th Dist. No. 99 CO 29. We cannot take the jump appellant wishes us to take, that because the court excluded certain allegedly exculpatory evidence, his right against self-incrimination was violated. Furthermore, because appellant chose not to testify, he did not incriminate himself. Thus, appellant cannot contend that he was compelled to be a witness against himself. Accordingly, appellant's third assignment of error is without merit.
 {¶ 39} Appellant's fourth assignment of error states:
 {¶ 40} "Pursuant to art. IV, 3(B)(3) of the Ohio State Constitution, the verdict convicting appellant Scott of aggravated murder and attempted aggravated murder was against the manifest weight of the evidence."
 {¶ 41} Appellant argues that the jury's verdict was against the manifest weight of the evidence due to alleged reasonable doubt arising from the gunshot residue found on his hands. Appellant contends that because police failed to test Mickel's hands for gunshot residue, the evidentiary value of the gunshot residue found on his hands did not support his conviction. He claims that in the absence of a gunshot residue test on Mickel, the gunshot residue test on his hands could not prove that he was the one who fired the gun. He points to Lynn's testimony that gunshot residue can be transferred in ways other than shooting a gun. (Tr. 353-54). He also alleges that Byrd's testimony that appellant was the shooter was unreliable because Byrd had smoked a large amount of marijuana that day.
 {¶ 42} In determining whether a verdict is against the manifest weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences and determine whether, in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. State v. Thompkins (1997),78 Ohio St.3d 380, 387. "Weight of the evidence concerns `the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other.'" Id. (Emphasis sic.) In making its determination, a reviewing court is not required to view the evidence in a light most favorable to the prosecution but may consider and weigh all of the evidence produced at trial. Id. at 390.
 {¶ 43} Still, determinations of witness credibility, conflicting testimony, and evidence weight are primarily for the trier of the facts. State v. DeHass (1967), 10 Ohio St.2d 230, paragraph one of the syllabus.
 {¶ 44} Appellant was convicted of aggravated murder in violation of R.C. 2903.01(A)(C) and attempted aggravated murder in violation of R.C. 2923.02(A)(E) and 2903.01(A)(C).
 {¶ 45} R.C. 2903.01(A) provides, in relevant part:
 {¶ 46} "No person shall purposely, and with prior calculation and design, cause the death of another * * *."
 {¶ 47} R.C. 2923.02(A) provides:
 {¶ 48} "No person, purposely or knowingly, and when purpose or knowledge is sufficient culpability for the commission of an offense, shall engage in conduct that, if successful, would constitute or result in the offense."
 {¶ 49} Appellant takes issue with the gunshot residue evidence and Byrd's testimony. We will address each in turn.
 {¶ 50} Lynn, the BCI crime lab director, testified as to the results of the gunshot residue test Officer Jeffrey Lewis performed on appellant's hands. The test revealed that appellant had gunshot residue on both hands. (Tr. 345). Lynn testified that appellant had two particles on his left hand and seven particles on his right hand (Tr. 345-46). He further stated that the average number of particles he finds on a positive test is two to three particles. (Tr. 346). Thus, the amount on appellant's right hand was above average for a positive test. (Tr. 346).
 {¶ 51} Lynn also explained that when someone fires a gun, the gunshot residue settles on any nearby objects within approximately a two feet radius, the most obvious object being the shooter's hands. (Tr. 353). He further stated that if someone fired a gun and then set it down and someone else picked it up, the second person could have gunshot residue on his hands. (Tr. 353-54).
 {¶ 52} As he argues in his first assignment of error, appellant contends here that since the police did not perform a gunshot residue test on Mickel, Lynn's testimony does not demonstrate that appellant was the shooter. While Lynn's testimony does not conclusively implicate appellant as the shooter, Lynn's testimony, together with the rest of the evidence, establishes appellant's guilt. Thus, we must examine the rest of the evidence.
 {¶ 53} Byrd was the only eyewitness to testify. He stated that he and Ms. Townsend were walking to the store when they saw appellant and Mickel standing on the corner. (Tr. 185-86). He stated that appellant began yelling and trotting towards them. (Tr. 186). Byrd told Ms. Townsend to move quickly away. (Tr. 186-87). Byrd knew appellant and knew that he carried a gun. (Tr. 187). He also testified that he and appellant had been involved in an altercation a month or two previously and that there was bad blood between them. (Tr. 187-88).
 {¶ 54} As the two were moving away from appellant and Mickel, a car pulled out of a driveway. (Tr. 189). Byrd testified that he opened the car door, ushered Ms. Townsend inside, and got in after her. (Tr. 190). He stated that by the time he closed the car door, a gunshot was fired. (Tr. 190). Byrd testified that he saw appellant holding the gun back in his arm. (Tr. 194). When he saw appellant had a gun, Byrd ducked and saw appellant shoot Ms. Townsend. (Tr. 196). He stated that appellant and Mickel then fled down the street. (Tr. 197). Byrd testified that after the police arrived and were taking him to the station for questioning, he saw appellant walking down the street. (Tr. 199). He identified appellant to the police as the gunman. (Tr. 199-200).
 {¶ 55} Byrd admitted to having smoked about two marijuana joints earlier that night, around 9:00 p.m. (Tr. 221-22). He then went to sleep until approximately midnight. (Tr. 222). On cross-exam, appellant's counsel asked Byrd how high he was that night. Byrd stated, "I wasn't that high." (Tr. 223). He attributed that to being an addict. (Tr. 223). Byrd denied being under the influence of any other drugs or alcohol. (Tr. 221, 223). And Officer John Aeppli testified that when he spoke with appellant after the shooting, appellant did not appear to be under the influence of anything. (Tr. 274).
 {¶ 56} Appellant takes issue with Byrd's credibility because of his admission to smoking what appellant characterizes as "a large amount" of marijuana that night. Whether two joints is a large amount of marijuana is debatable. Byrd admitted to being an experienced marijuana smoker, so two joints may not have had a substantial effect on him. Furthermore, Byrd smoked the joints around 9:00 p.m. He then slept for several hours before walking to the store, thus allowing time for the effects of the marijuana to wear off. Regardless, the jury had all of the information before them. They were the judges of Byrd's credibility.
 {¶ 57} Furthermore, Byrd's testimony at trial was consistent with what he told Ms. Townsend's grandmother and police officers immediately after the shooting. Willa Mae Robinson, Officer Aeppli, and Detective Sergeant Steve Dunn all testified that Byrd told them immediately after the shooting that appellant shot Ms. Townsend. (Tr. 173, 265, 288).
 {¶ 58} Examining the other evidence adduced at trial reveals the following. Appellant told Detective Sergeant Gerald Maietta that he was out and about on the south side of Youngstown that night, going to a couple of house parties, his girlfriend's house, and his grandmother's house. (Tr. 380-84). He indicated to Detective Maietta that he was on Evergreen Street when he heard a shot. (Tr. 384). Appellant refused to tell the police who he was with earlier that night. (Tr. 385-85). Detective Maietta testified that he asked appellant that night what would he say if the gunshot residue test came back positive. (Tr. 386). Appellant told him that the test would be mistaken. (Tr. 386). Detective Maietta also testified that his investigation led him to conclude that appellant was the shooter. (Tr. 375).
 {¶ 59} In appellant's defense, Donnell Cuthbertson testified. Cuthbertson had been in jail with appellant and Mickel. (Tr. 417). Cuthbertson testified that while in jail, he overheard a conversation between appellant and Mickel. (Tr. 418). According to Cuthbertson, Mickel asked appellant if he was going to tell on him. (Tr. 419). Cuthbertson said he heard Mickel state, "I tried to kill that N-I-G-G-A" and he did not understand how Ms. Townsend was hit. (Tr. 419). On cross-examination, Cuthbertson stated that he never told any police officers that he overheard this conversation. (Tr. 425).
 {¶ 60} Additionally, LaKeisha Carter testified for appellant. She was appellant's girlfriend at the time of the shooting. (Tr. 454). She stated that on the night in question, appellant and Mickel were at her house for a while. (Tr. 457). Ms. Carter stated that appellant and Mickel left together and that Mickel had a gun on him but appellant did not. (Tr. 457-58). Ms. Carter also stated that appellant sometimes carried guns. (Tr. 466-67). She stated that the two later returned and she heard Mickel say that his gun jammed on him and only shot one time. (Tr. 459). She further stated that she heard Mickel say, "I know I hit somebody." (Tr. 459). Ms. Carter stated that when the officers were at her house, she never told them about what Mickel had said, nor did she tell anyone what she knew for five years. (Tr. 500-505).
 {¶ 61} And Detective Sergeant Michael Lambert testified that when he and another officer arrived at Ms. Carter's house in the early morning hours after the shooting, Ms. Carter and/or her mother refused to let them search the room where appellant sometimes stayed. (Tr. 521).
 {¶ 62} Considering all of the evidence, the jury had competent, credible evidence on which to base its decision. Byrd, the only eyewitness to testify, identified appellant as the shooter. The gunshot residue evidence and most of the other evidence corroborated Byrd's story. Given the above evidence, we cannot conclude the jury clearly lost its way and created a manifest miscarriage of justice in convicting appellant. Accordingly, appellant's fourth assignment of error is without merit.
 {¶ 63} For the reasons stated above, the trial court's judgment is hereby affirmed.
Waite, P.J., concurs.
DeGenaro, J., concurs.